NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0264n.06

Nos. 23-5008/5009/5824/5825

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| GEORGE A. GRAYIEL, | ) | FILED |
|  | ) | Jun 14, 2024 |
| Plaintiff-Appellee, | ) | KELLY L. STEPHENS, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE WESTERN |
| AIO HOLDINGS LLC, et al., | ) | DISTRICT OF KENTUCKY |
|  | ) |  |
| Defendants-Appellants. | ) | OPINION |
|  | ) |  |

Before: SILER, MOORE, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. George Grayiel sued four defendants—two companies, and the two people who controlled them, respectively—alleging their involvement in a decade-long conspiracy to hide assets of a convicted fraudster, Martin Twist. After a bench trial, the district court found each defendant liable for various counts of fraud and civil conspiracy. The defendants now appeal. We affirm.

I.

We recite the facts below as found by the district court after a bench trial. *Grayiel v. AIO Holdings, LLC*, 648 F. Supp. 3d 812 (W.D. Ky. 2022).

In 2000 and 2001, plaintiff George Grayiel invested about $860,000 into a group of West Virginia oil and gas wells (the "Natural Gas Assets") and several energy companies, all of which were owned by Martin Twist. Grayiel would never see that money again.

Twist had an "F the investors" mentality and told his employees to skip payments to "unimportant" creditors. Twist once asked a former associate, Lonny Armstrong, to create a new company in Armstrong's name so that Twist could "get away from all the creditors." In the mid-2000s, the IRS, FBI, and SEC each began investigating Twist. Lawsuits from creditors followed. In 2005, Twist asked Armstrong to file a sham employment suit against Twist, seeking $500,000 and a royalty percentage in the Natural Gas Assets as damages. Twist's plan was for Armstrong to secure a judgment lien over the Natural Gas Assets, which Twist could use to shield them from government agencies and creditors. That lawsuit was never filed.

In 2005, defendant Gregory Anastas formed defendant AIO Holdings, LLC, to execute a loan agreement that authorized Twist and his companies to draw up to $2,000,000 on a line of credit secured by the Natural Gas Assets. Twist and Anastas used the same lawyer in preparing the agreement. After signing it, Twist told Armstrong that the agreement's goal was the "same" as the proposed employment suit—namely, to shield money from creditors.

In 2008, Twist told Anastas that he was "worried somebody might be after him" and asked Anastas to hire Twist's lawyer to help AIO file a foreclosure lawsuit against Twist (and some of his companies). Anastas and Twist agreed to enter a consent judgment after the complaint was filed; Twist told his (and now Anastas's) lawyer that the goal was to "ti[e] up" Twist's assets. That lawyer filed AIO's complaint in Kentucky court, requesting damages of an amount "not to exceed Two Million Dollars" plus interest, along with "immediate possession, title and control of" the Natural Gas Assets. At the time, however, Twist owed AIO only $250,000 plus interest.

A month after filing the complaint, the parties agreed to a consent judgment (the "Agreed Judgment"), which gave AIO immediate possession of the Natural Gas Assets. AIO and a Twist-owned company then signed an operating agreement that gave Twist authority to operate the

Natural Gas Assets and to retain all net revenues in escrow until they reached $500,000, at which point Twist would split the revenues with AIO.

Meanwhile, in 2008, Grayiel sued Twist, some of Twist's associates, and several Twist-owned companies for fraud in West Virginia state court demanding the return of his investment plus interest. That suit did not include the defendants in this case and would go on for six years.

Almost a year later, while Grayiel's lawsuit was pending, defendant Sarinprapa Teema moved to Kentucky to work as a caretaker for Twist's son. Twist and Teema later became romantically involved and had a child. Teema often helped Twist pay both household and company bills and became a signatory on certain business accounts.

In February 2012, while Teema and Twist were living together, Twist was indicted for tax evasion. In October 2012, Twist helped Teema incorporate Blue Light of Kentucky Limited Liability Company ("Second Blue Light"), a company with a near-identical name to one of Twist's companies (here, "First Blue Light") that received Natural Gas Asset revenues from AIO. The Blue Light companies shared the same bank account. Two months later, the companies entered an agreement (the "Right of Way Agreement") that assigned all of First Blue Light's rights to a specific gas pipeline to Second Blue Light. First Blue Light received nothing in exchange.

In July 2013, Twist pled guilty to tax evasion. Twist was sentenced in October 2013 and reported to prison in December. A few months later, he died.

Anastas and Teema met at Twist's funeral. On March 31, 2014, their companies—AIO and Second Blue Light—entered into an operating agreement (the "SBL Agreement"). Teema's lawyer in this appeal, Bryan Dillon, drafted the agreement for both parties. Under that agreement, Second Blue Light would "operate" the wells and pay AIO only half of their net proceeds. AIO would then credit its portion of the proceeds towards Second Blue Light's purchase of the Natural

Gas Assets for $466,000. Second Blue Light's "operation" of the wells consisted of Teema sending emails and checks for about three hours a month, in exchange for which Second Blue Light received about $2,750 a month.

In August 2014, the West Virginia court awarded Grayiel $2,671,880.84 in his suit against Twist (by then, his estate). Grayiel soon learned that the Natural Gas Assets were not part of Twist's estate. Grayiel also discovered the Agreed Judgment, but "presumed that the court's judgment and subsequent assignment were legitimate." By the summer of 2015, however, Grayiel realized that the Agreed Judgment was fraudulent as well.

Grayiel soon brought this suit against AIO, Anastas, Teema, and Second Blue Light, asserting nine claims of fraud, conspiracy, and the like. The district court had diversity jurisdiction in this case because Grayiel is West Virginian and the defendants are each Kentucky citizens. *V & M Star, LP v. Centimark Corp.*, 596 F.3d 354, 355 (6th Cir. 2010). The district court thereafter held a bench trial, after which it found—in two meticulously reasoned opinions—that the defendants had engaged in various kinds of fraud and that Grayiel was entitled to $1,652,416 in compensatory damages and $1,652,416 in punitive damages. This appeal followed.

II.

We accord the district court's factual findings "considerable deference." *Atkins v. Parker*, 972 F.3d 734, 739 (6th Cir. 2020). We review the district court's legal conclusions de novo. *Id.*

The defendants here come to us with more than a dozen grounds for reversing the district court, which "usually means there are none." *Fifth Third Mortg. Co. v. Chicago Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012). We consider their arguments in turn.

A. Statute of Limitations

First, the defendants argue that Grayiel's claims were untimely. In Kentucky, a cause of action for fraud accrues when a plaintiff discovers the fraud, after which he has five years to bring a claim. Ky. Rev. Stat. §§ 413.120(11), 413.130. No matter when the fraud is discovered, however, the claim must be brought within 10 years of the fraudulent act. Ky. Rev. Stat. § 413.130(3).

The defendants argue that Grayiel's cause of action for fraud accrued in 2008, making Grayiel's 2015 lawsuit untimely. Specifically, they say, once the Agreed Judgment was filed, Grayiel received constructive notice of the fraud, thereby triggering the limitations period. Defendants are correct that in Kentucky, the public recording of a deed or similar public filing often triggers the accrual of a cause of action. *Shelton v. Clifton*, 746 S.W.2d 414, 417 (Ky. Ct. App. 1988). But that rule does not apply when a plaintiff did not and a "reasonabl[y] diligen[t]" person would not have discovered the fraud within five years. *Id.*

Here, Grayiel hired multiple law firms, cooperated with federal agents, contacted various state agencies for records, filed FOIA requests, and researched county-courthouse records to gain more information about Twist and the Natural Gas Assets. Yet he found no evidence of AIO and Anastas's fraud. Moreover, the Agreed Judgment itself was "signed by the Circuit Court Judge, the parties," and multiple counsel, and "appeared to be the product of a litigated compromise of a legitimate commercial debt." Indeed, as the district court noted, the Agreed Judgment appears to have fooled even government agencies. Twist's fraud was readily discoverable only when Armstrong explained it to Grayiel in 2015. The district court did not err when it found that neither Grayiel nor a reasonably diligent plaintiff could have discovered the fraud before then.

Anastas also asserts that Grayiel's civil-conspiracy claims were untimely. But that argument is undeveloped and thus waived. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

B. Fraudulent Conveyance

The defendants also challenge the district court's conclusion that the Agreed Judgment, the Right of Way Agreement, and the SBL Agreement were fraudulent conveyances under Kentucky law. A Kentucky statute made any "conveyance, assignment or transfer" made with "the intent to delay, hinder or defraud creditors" void "against such creditors." Ky. Rev. Stat. § 378.010 (2015) (repealed eff. Jan 1, 2016). Here, the district court found numerous "badges of fraud" as to these transactions, which shifted to the defendants the burden of showing that the transactions were made in good faith. *Russell Cnty. Feed Mill, Inc. v. Kimbler*, 520 S.W.2d 309, 312 (Ky. 1975). Suffice it to say that the district court did not err in concluding that the defendants had not met that burden. Among other things, Anastas was "not a credible witness," the district court found, not least because he admitted to perjuring himself in a related case. And the Right of Way and SBL Agreements alike transferred significant value to Teema for little or no value in return.

The district court did not err in finding all these transactions voidable.

C. Common-Law Fraud

Anastas next challenges the district court's finding that the Agreed Judgment was fraudulent as to Grayiel. Yet the record shows that AIO sued Twist at Twist's own suggestion, using Twist's lawyer; that the suit strongly implied that Twist owed a multiple of the amount ($250,000) that Twist actually owed AIO, *see United Parcel Serv. v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999) (holding that "willfully failing to disclose the truth" may "be fraudulent if it is materially misleading"); and that the suit was filed for the purpose of shielding assets from Twist's

creditors, including Grayiel. Thus, the suit and the Agreed Judgment themselves were false representations upon which Anastas, AIO, and Twist intended Twist's creditors to rely. *See Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (explaining the elements of common-law fraud). And the district court properly found that Grayiel in fact relied on the Agreed Judgment when he initially did not seek relief against AIO. The district court did not err in any respect as to this claim.

D. Aiding and Abetting

The defendants next challenge the district court's conclusion that they aided and abetted Twist's fraud. Kentucky law defines aiding and abetting as requiring: (1) "knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 533 (6th Cir. 2000) (referencing Restatement (Second) of Torts § 876(b)); *Farmer v. City of Newport*, 748 S.W.2d 162, 164 (Ky. Ct. App. 1988).

Teema challenges the district court's finding as to the first element of aiding and abetting: that she knew about Twist's fraud. Specifically, she challenges the district court's determination that she was not credible when she testified that she was unaware of Twist's creditors and his federal indictment when she formed Second Blue Light. But Teema admitted that she had formed Second Blue Light so she could keep Twist's assets for herself after he died; and that she had paid his bills for years, was often copied on his emails, and had taken over operating the wells after his death. We therefore have ample reason to defer to the district court's credibility finding here. *See Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 547 (6th Cir. 2010).

Anastas separately argues that that he and AIO cannot be liable for aiding and abetting because they committed no underlying tortious act. That argument is meritless because the court found that they did commit a tortious act—namely, common-law fraud.

### E. Civil Conspiracy

Teema's challenge to her civil-conspiracy liability is identical to her challenge to the aiding-and-abetting liability—lack of intent and knowledge—and fails for the same reason.

Anastas, for his part, seems to argue that he and AIO could not be liable for civil conspiracy unless they owed a fiduciary duty to Grayiel. But he cites no support for that proposition, and we see none. *See, e.g., Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008).

### F. Damages

We have also reviewed the defendants' remaining arguments—as to the amount of Grayiel's damages and as to the court's decision to award punitive damages, among others—and we conclude that all those arguments are meritless, or inadequately developed, or both.

\*      \*      \*

The district court's judgment is affirmed.